## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| VIJAY MURUGESH ADAIKKAPPAN, <br><br> Plaintiff, <br><br> v. <br><br> LIFE INSURANCE COMPANY OF NORTH AMERICA, <br><br> Defendant. | CIVIL ACTION <br><br> No. _____ |

## COMPLAINT

Plaintiff, Vijay Murugesh Adaikkappan, hereby brings a civil action against Defendant, Life Insurance Company of North America, based on the following:

## JURISDICTION AND VENUE

1.      Jurisdiction arises from the Employee Retirement Income and Security Act (ERISA), Section 502(a)(1)(B) [29 U.S.C. § 1132(a)(1)(B)].

2.      At all relevant times, Plaintiff Vijay Murugesh Adaikkappan (Mr. Adaikkappan) was, and is, an employee of McKesson Corporation (McKesson). (McKesson is now known as Change Healthcare. However, to avoid confusion, we will refer to the employer as McKesson.)

3.      Mr. Adaikkappan is a Senior Business Analyst for McKesson.

4.      McKesson endorsed a Long-Term Disability Plan, issued by the Life Insurance Company of North America, Policy No. LK-980041 (LTD Plan), which was subject to ERISA.

5.      Mr. Adaikkappan was and is a Participant in the LTD Plan.

6.     At all relevant times, Mr. Adaikkappan's primary place of residence was in Chester County, Pennsylvania. Venue in the Eastern District of Pennsylvania is appropriate pursuant to 29 U.S.C. § 1132(e)(2).

7.     Defendant was the named fiduciary for deciding claims for benefits under the LTD Plan.

8.     The LTD Plan denied Mr. Adaikkappan's previously-approved claim for benefits.

9.     Mr. Adaikkappan has exhausted all mandatory internal appeals under the LTD Plan.

## STATEMENT OF FACTS

### Overview

10.     Paragraphs 1-9 are incorporated herein by reference.

11.     Mr. Adaikkappan had worked a full-time work schedule for McKesson prior to October 2015.

12.     Mr. Adaikkappan has been diagnosed with numerous medical conditions, most notably chronic left iliac vein stenosis, chronic venous insufficiency, chronic deep vein thrombosis of the leg, including a fully occlusive femoral vein and a partially occlusive popliteal vein. These conditions lead to venous valvular reflux and chronic lymphedema.

13.     Anticoagulation therapy is contraindicated due to the fibrous nature of the clotting, as well as gastrointestinal issues.

14.     Without compliance with a therapy schedule, these conditions tend to progress, leading to venous stasis ulcers.

15.     Mr. Adaikkappan's physicians have determined that there is no surgical intervention available for his conditions.

16.     Mr. Adaikkappan's chronic medical conditions require him to take frequent therapy breaks from work. He requires hourly physical therapy breaks as well as periodic mechanical compression therapy breaks.

17.     Mr. Adaikkappan cannot work during these therapy breaks.

18.     The medical need for these frequent therapy breaks, and the inability to work during these therapy breaks, prevents Mr. Adaikkappan from accomplishing the expectations of a full-time workday during regular full-time workday hours.

19.     Instead, because of the medical need for frequent therapy breaks, Mr. Adaikkappan requires the time of a full workday in order to consistently accomplish a half-workday (approximately four hours) of work.

20.     With McKesson's approval, Mr. Adaikkappan has worked a part-time, four hours per day work schedule for McKesson since October 2015.

21.     McKesson was the payor of a Short-Term Disability (STD) claim, from October 2015 through April 2016.

22.     CIGNA Group Insurance ("CIGNA"), a co-agent of the Defendant, was the independent claims administrator of the STD Plan.

23.     CIGNA approved the Partial STD Claim in October 2015.

24.     However, CIGNA attempted to deny the Partial STD Claim in March 2016.

25.     On appeal, McKesson reversed CIGNA's denial of the Partial STD Claim.

26.     In April 2016, the partial disability claim transitioned from STD to LTD.

27.     The Defendant was the payor for the LTD claim.

28.     CIGNA approved the Partial LTD Claim for benefits on May 27, 2016.

29.     At no time did CIGNA ever seek an Independent Medical Examination of Mr. Adaikkappan, as had been permitted by the LTD Plan Policy.

30.     At no time did CIGNA ever attempt to implement a Rehabilitation Plan for Mr. Adaikkappan, as had been permitted by the LTD Plan Policy.

31.     At no time did CIGNA ever attempt to identify exactly what medical documentation it required in order to sustain continuance of previously approved partial long-term disability claim benefits.

32.     Nonetheless, in September 2016, CIGNA reversed its series of previous determinations that Mr. Adaikkappan had a legitimate partial disability claim.

33.     Upon appeal, on May 4, 2017, CIGNA upheld their claim denial.

34.     CIGNA has consistently acted in bad faith against Mr. Adaikkappan in this matter.

**Background - The Short-Term Disability Claim**

35.     McKesson offered a Short-Term Disability (STD) Plan to its employees.

36.     Mr. Adaikkappan was a beneficiary of that STD Plan.

37.     The STD Plan covered both partial and full disability claims.

38.     The STD Plan covered 26 weeks of partial and/or full disability.

39.     The STD Plan provided an elimination period of one week before partial or full disability benefits were payable.

40.     Under the STD Plan, the elimination period week was considered Week 1 of the 26-week short-term disability plan.

41.     The STD Plan was a self-insured plan. McKesson directly paid the benefits for claims made under the STD Plan.

42.     McKesson utilized CIGNA Group Insurance (CIGNA) as an independent claim administrator of the STD Plan.

43.     In 2015, Mr. Adaikkappan requested a part-time, four-hours-per-day work schedule, claiming the existence of a partial disability that prevented him from performing a full-time work schedule.

44.     McKesson granted the request to work the part-time schedule due to Mr. Adaikkappan's partial disability.

45.     The part-time work schedule commenced Monday, October 12, 2015.

46.     Mr. Adaikkappan filed a claim for partial disability benefits under the STD Plan.

47.     On Friday, October 23, 2015, CIGNA issued a letter approving the Partial STD Claim.

48.     In the October 23, 2015 letter, CIGNA approved payment of Partial STD benefits through November 12, 2015 (Week 5).

49.     Pursuant to the terms of the STD Plan, Mr. Adaikkappan's supervising manager promptly and consistently reported Mr. Adaikkappan's actual work hours under the partial disability claim to CIGNA.

50.     In November 2015, CIGNA issued another extension of benefits letter, covering Weeks 5 through 10.

51.     At that time, CIGNA was aware of the fact that Mr. Adaikkappan consistently worked a half-day work schedule under his partial disability claim.

52.     On December 23, 2015 (Week 11), CIGNA issued another extension of Partial STD benefits notice to Mr. Adaikkappan. This covered Weeks 11 through 16.

53.     The December 23, 2015 notice stated that Partial STD benefits were approved through January 31, 2016 (Week 16).

54.     For reasons left unstated, on January 20, 2016 CIGNA transferred responsibility for the Partial STD Claim from one Claims Manager to another.

55.     On February 11, 2016, via e-mail from CIGNA's new Claims Manager to Mr. Adaikkappan, CIGNA notified Mr. Adaikkappan that CIGNA's Nurse Case Manager "is requesting to see the office visit notes from both your family doctor and vascular surgeon. Please provide me with both providers names and the last time you seen each and I can send out the medical requests." [*sic*]

56.     Of course, CIGNA had already been in possession of those names and numbers, when it approved, and then twice re-approved, the Partial STD Claim.

57.     Nonetheless, CIGNA claimed non-cooperation with their demands for ongoing medical records, and issued a denial of the Partial STD Claim on March 10, 2016, to be effective retroactive to January 31, 2016.

58.     Mr. Adaikkappan timely appealed CIGNA's denial.

59.     On March 17, 2016, Mr. Adaikkappan submitted a doctor visit note and a completed medical records request form to CIGNA's Claims Manager, via e-mail.

60.     On March 18, 2016, CIGNA's Claims Manager acknowledged receipt of the doctor visit note and completed medical records request form, via e-mail to Mr. Adaikkappan.

61.     On March 21, 2016, in a phone call from Mr. Adaikkappan to CIGNA's Claims Manager that was intended to follow up on CIGNA's request for medical records, CIGNA's Claims Manager broached the issue of the STD Plan's "Elimination Period" with Mr. Adaikkappan for the first time.

## CIGNA's 11th Hour Effort to Crush the STD Claim in Order to Avoid the Looming LTD Claim

62.     On Wednesday, March 23, 2016 (middle of Week 24), CIGNA issued a denial and total rescission of all Partial STD benefits previously paid under the STD Plan.

63.     The effect of this rescission would have been to invalidate the entire Partial STD Claim, and thereby defeat the looming Partial LTD Claim, payable by CIGNA's co-agent, the Defendant. (Both CIGNA and the Defendant are wholly-owned subsidiaries of CIGNA Corporation).

64.     The Partial LTD Claim required a valid elimination period of 180 days. Thus, if the Partial STD Claim was invalid *ab initio*, as CIGNA alleged, then Mr. Adaikkappan would have been forced to reapply for Partial STD benefits (payable by McKesson), and would have required an additional 180-day elimination period before becoming eligible for Partial LTD benefits payable by the Defendant.

65.     Thus, in the March 23, 2016 letter, CIGNA claimed that all Partial STD benefits had been wrongly paid because Mr. Adaikkappan did not miss one "full day" of work during the Elimination Period of his partial disability claim. CIGNA claimed that Mr. Adaikkappan failed to fulfill a requirement of the Elimination Period, because he worked a half-day, and never missed a full day, conveniently finding it irrelevant that it had been a Partial STD Claim, not a total STD claim.

66.     As noted, CIGNA was fully aware of Mr. Adaikkappan's actual work schedule well before Week 24.

67.     Mr. Adaikkappan timely appealed CIGNA's novel Week 24 interpretation of the STD Plan.

68.     On appeal, McKesson agreed with Mr. Adaikkappan, and disagreed with CIGNA's novel Week 24 interpretation of the STD Plan.

69.     McKesson reversed CIGNA's attempt to rescind all Partial STD benefits.

70.     McKesson found that Mr. Adaikkappan had a valid Partial STD Claim.

71.     McKesson restored Mr. Adaikkappan's short-term partial disability benefits. McKesson paid those benefits through Friday, April 8, 2016 (Week 26) of the STD Plan.

### The Long-Term Disability Claim

72.     After exhausting 26 weeks under the STD Plan, Mr. Adaikkappan was entitled to file a claim for long-term partial disability, under the LTD Plan endorsed by McKesson.

73.     The LTD Plan was underwritten by the Defendant, the Life Insurance Company of North America.

74.     The Life Insurance Company of North America is a wholly-owned subsidiary of CIGNA Corporation.

75.     CIGNA Group Insurance (CIGNA) also is a wholly-owned subsidiary of CIGNA Corporation.

76.     CIGNA Group Insurance (CIGNA), who had been the independent claims administrator of McKesson's STD Plan, was also the claims administrator of the LTD Plan underwritten by the Defendant, the Life Insurance Company of North America.

77.     CIGNA acknowledged the LTD Claim in a letter dated March 17, 2016.

78.     On April 6, 2016, an LTD Claims Manager at CIGNA requested completion of CIGNA's Long-Term Disability Questionnaire and its Activities of Daily Living forms, via e-mail to Mr. Adaikkappan.

79.     On April 28, 2016 a CIGNA form, "Physical Ability Assessment" was completed by Dr. Malireddy, an Internal Medicine physician long primarily responsible for Mr. Adaikkappan's medical care.

80.     CIGNA's Physical Ability Assessment form, for use by physicians, defined "occasionally" as zero to 2.5 hours per workday.

81.     Also on April 28, 2016, Mr. Adaikkappan completed his CIGNA LTD Questionnaire & Activities of Daily Living" form.

82.     On Mr. Adaikkappan's LTD Questionnaire & Activities of Daily Living form, when asked how often Mr. Adaikkappan "use[d] the computer," Mr. Adaikkappan responded "4 to 5 hrs per day[.]" This response was meant in the normal, ordinary, 24-hour aspect of the word "day." The form did not define the term "day" differently.

83.     On Friday, May 6, 2016, Mr. Adaikkappan submitted the completed Long-Term Disability Questionnaire and Activities of Daily Living forms to CIGNA, via e-mail.

84.     On May 10, 2016, the CIGNA Claims Manager acknowledged receipt of the completed Long-Term Disability Questionnaire and Activities of Daily Living forms, via e-mail to Mr. Adaikkappan. The CIGNA Claims Manager also asked that Mr. Adaikkappan confirm that he is continuing to work in a part-time status.

85.     Also on May 10, 2016, a CIGNA Nurse Case Manager offered this note to CIGNA's internal claim file:

> Cx [claimant] experienced venous insufficiency with complication with medication of possible GI bleeding/gastritis. EE using lymphedema pump multiple times a day limiting function at work.
>
> Severe thrombophlebitis and venous insufficiency which *is supported by ultrasound results.* Exam *did show* venous stasis, lymphedema lower extremity with continued use of lymphedema pump several times a day *that could limit functionality at work.*

(emphasis added).

86.     On May 20, 2016, a CIGNA Certified Rehabilitation Counselor concluded, in an internal note to CIGNA's claim file, that Dr. Malireddy's restrictions were not consistent with the required physical demands of the claimant's occupation. In layman's terms, this meant that Mr. Adaikkappan had a valid partial disability claim.

87.     On May 24, 2016, a different CIGNA Certified Rehabilitation Counselor similarly concluded: "The claimant[']s outlined restrictions of occasional standing, occasional walking, and occasional lift/push/pull/carry up to 10 lbs. are not consistent with the required physical demands of his occupation, Business Systems Analyst 3."

88.     On May 27, 2016, an internal CIGNA note concluded in part:

> After the 5/24/2016 own occ analysis the Cx's restrictions are not consistent with the required physical demands of his occupation,

Business Systems Analyst 3. Cm [Case manager] will follow up

for ongoing treatment and continued part-time work.

89.     Thus, Mr. Adaikkappan's partial LTD claim was formally approved by CIGNA on May 27, 2016, retroactive to Monday, April 11, 2016, via e-mail from Mr. Ong to Mr. Adaikkappan.

90.     As had been done on the previously-approved-then-not-approved Partial STD Claim (see *supra,* ¶¶ 47 and 54), on July 11, 2016, for reasons unstated, CIGNA changed the Claims Manager responsible for this Partial LTD Claim.

91.     On July 12, 2016, a CIGNA Vocational Rehabilitation professional offered, in an internal CIGNA note regarding establishment of a rehabilitation plan: "[T]his cx [claimant] appears to not be an appropriate candidate for services *due to severity of cx medical condition.* It appears that this Cx is working at maximum capacity for now." (emphasis added)

92.     On July 26, 2016, the new CIGNA Claims Manager requested, via e-mail to Mr. Adaikkappan, completion of the previously-completed Long-Term Disability Questionnaire and Activities of Daily Living forms.

93.     On September 7, 2016, Mr. Adaikkappan re-submitted medical documentation, which had previously been submitted to the second CIGNA Claims Manager on the STD Claim on March 17, 2016, via e-mail to the second Claims Manager for the LTD Claim.

### CIGNA's Failure to Timely Produce the LTD Plan Documents

94.     On July 26, 2016, in a phone call from Mr. Adaikkappan to the new CIGNA Claims Manager, Mr. Adaikkappan requested that he be sent a copy of the LTD Plan Policy documents.

95.     During that phone call, the new CIGNA Claims Manager told Mr. Adaikkappan that Mr. Adaikkappan could request the LTD Plan Policy documents by e-mail.

96.     Therefore, on Tuesday, July 26, 2016, Mr. Adaikkappan submitted a formal request for a copy of the LTD Plan Policy documents, via e-mail from Mr. Adaikkappan to the new CIGNA Claims Manager.

97.     The next week, on Tuesday, August 2, 2016, the CIGNA Claims Manager, via e-mail to Mr. Adaikkappan, acknowledged Mr. Adaikkappan's request for a copy of the LTD Plan Policy documents.

98.     In mid-August, the CIGNA Claims Manager, via e-mail to Mr. Adaikkappan, insisted that Mr. Adaikkappan submit another request for the LTD Plan Policy documents.

99.     Mr. Adaikkappan dutifully complied with the request to re-submit his request for the LTD Plan Policy documents.

100.     Mr. Adaikkappan followed up more than once on his second request for the LTD Plan Policy documents.

101.     The CIGNA Claims Manager informed Mr. Adaikkappan that her supervisor was reviewing the LTD Plan Policy, and that it would be sent to him as soon as possible.

102.     CIGNA did not tender a copy of the LTD Plan Policy documents until early October 2016, under cover letter dated Friday, September 30, 2016 (day 66).

103.     CIGNA sent Mr. Adaikkappan a set of loose papers regarding the LTD Plan Policy documents, via mail.

104.     Mr. Adaikkappan received CIGNA's production on October 8, 2016, 74 days after Mr. Adaikkappan's request had been sent via e-mail to the CIGNA Claims Manager.

**CIGNA's Failure to Timely Pay the Approved LTD Claim Benefits**

105.    The LTD Plan indicates that benefits are to be paid not less frequently than monthly.

106.    Mr. Adaikkappan's claim for benefits had been approved on May 27, 2016, effective as of April 11, 2016.

107.    Mr. Adaikkappn reasonably expected to receive payment in June, but did not.

108.    Mr. Adaikkappan reasonably expected to receive payment in July, but did not.

109.    Mr. Adaikkappan inquired about the reason for the delay.

110.    Initially, CIGNA claimed it had sent a request to McKesson for proof of continued employment for the benefit periods, and that it had not received any response from McKesson.

111.    Given CIGNA's difficulty communicating with McKesson, Mr. Adaikkappan inquired if he could submit his paystubs as sufficient proof. However, the CIGNA Claims Manager stated that the information had to come directly from McKesson.

112.    Mr. Adaikkappan followed up with McKesson, who denied having received any such request from CIGNA.

113.    It appears that the CIGNA Claims Manager's request had been misaddressed. CIGNA's internal records show that a May 27, 2016 request was made to "Payrollatmckesson.com". Thus, McKesson did not receive the request from CIGNA.

114.    As had been done on the previously-approved-then-not-approved Partial STD Claim (see *supra,* ¶¶ 47 and 54), on July 11, 2016, for reasons unstated, CIGNA changed the Claims Manager responsible for this Partial LTD Claim.

115.    Contrary to the prior Claims Manager's advice, CIGNA's new Claims Manager stated that Mr. Adaikkappan could submit paystubs, and that the information did not have to come directly from McKesson as previously claimed.

116.    On August 2, 2016 via e-mail, CIGNA's new Claims Manager requested a copy of Mr. Adaikkappan's pay stub from May 10, 2016. May 10, 2016 was a Tuesday.

117.    On August 3, 2016 via e-mail, Mr. Adaikkappan responded to CIGNA's Claims Manager that McKesson has a bi-monthly pay schedule. Under that schedule, payment is made on the 15th of the month, and on the last day of the month. Therefore, Mr. Adaikkappan explained, there is no pay stub from Tuesday, May 10, 2016. Mr. Adaikkappan noted that he had previously provided the May 15 and May 31 paystubs, via fax to CIGNA's Claims Manager.

118.    On August 16, 2016, Mr. Adaikkappan notified CIGNA's Claims Manager, via e-mail, that he had yet to receive any payment whatsoever under his long-term disability benefits, which had been effective as of April 11, 2016.

119.    On August 19, 2016, Mr. Adaikkappan submitted his second July paystub, via e-mail to CIGNA's Claims Manager.

120.    On August 28, 2016, per the CIGNA Claims Manager's request, Mr. Adaikkappan re-submitted the previously completed CIGNA LTD Questionnaire and Activities of Daily Living forms, via e-mail.

121.    In August 2016, CIGNA finally released four months' worth of partial long-term disability benefit payments to Mr. Adaikkappan. This payment covered from April 11, 2016 through July 31, 2016.

122.    Mr. Adaikkappan submitted his two August paystubs to CIGNA on August 27, 2016.

123.    Given the prior difficulty with obtaining payment from CIGNA, Mr. Adaikkappan spoke to CIGNA's Claims Manager about the issue.

124.    At that time, CIGNA's Claims Manager informed Mr. Adaikkappan that payment of August benefits would be made by September 19, 2016.

125.    On September 21, 2016, Mr. Adaikkappan e-mailed CIGNA's Claims Manager, writing that he did not see any indication that the August benefits had been paid. Also at that time, Mr. Adaikkappan submitted the September 15, 2016 paystub.

### CIGNA's Denial of the Previously-Approved LTD Claim

126.    On Friday, September 16, 2016, CIGNA issued a denial ("Denial Letter") of long-term partial disability benefits to Mr. Adaikkappan, effective September 16, 2016.

127.    The Denial Letter claimed that Mr. Adaikkappan was able to work full time, and did not even suggest that a modified work environment might be needed.

128.    The Denial Letter dutifully noted that Dr. Malireddy's April 28, 2016 Physical Ability Assessment form indicated that Mr. Adaikkappan could "occasionally sit[.]"

129.    CIGNA's Physical Ability Assessment form defined "occasionally" as zero to 2.5 hours per workday.

130.    Nonetheless, the Denial Letter incorrectly concluded that Mr. Adaikkappan could "frequently" sit.

131.    The Denial Letter offered no medical evidence to support CIGNA's conclusion that Mr. Adaikkappan could "frequently sit" during the workday, as opposed to Dr. Malireddy's in-person assessment, in CIGNA's possession since May 2016, that Mr. Adaikkappan could only "occasionally sit" during a workday.

132.    The Denial Letter did not reference any medical record in its possession that supported the conclusion that Mr. Adaikkappan could sit "frequently" during the workday.

133.    The Denial Letter did not proffer any evidence that Mr. Adaikkappan's disability had improved in any way since the claim had been approved in May.

134.    The Denial Letter did not identify what medical information CIGNA required in order to overturn the denial.

### CIGNA's Failure to Timely Adjudicate the Mandatory Internal Appeal

135.    On January 17, 2017, an appeal of the Denial Letter was submitted to CIGNA.

136.    CIGNA acknowledged it received the appeal on January 23, 2017, in a letter dated February 8.

137.    In the February 8, 2017 acknowledgment letter, CIGNA immediately requested an extension of the 45-day decision period mandated by ERISA regulation.

138.    In the February 8, 2017 acknowledgment letter, CIGNA indicated it "hoped" to have the appeal decided within 45 days, and that "[a]t the latest," it would respond within 30 days.

139.    On March 8, 2017 (day 44), CIGNA wrote that they "are currently reviewing" the claim appeal, and that they would decide "as soon as possible." CIGNA wrote that if they required additional information, or if "there is a reason for delay," they would reach out "immediately."

140.    On April 6, 2017 (day 73), CIGNA issued another letter, essentially identical to the one sent in March. The April 6 letter offered no further rationale for the delay.

141.    On May 4, 2017 (day 101), CIGNA issued an unfavorable internal appeal determination (Internal Appeal Denial Letter).

142.    As CIGNA did when attempting to crush the Partial STD Claim, CIGNA based the Partial LTD claim denial on a reinterpretation of material that had long been in its possession.

143.    While CIGNA had been in possession of Mr. Adaikkappan's April 28, 2016 completed responses to CIGNA's "Disability Questionnaire & Activities of Daily Living" form when CIGNA had approved LTD benefits on May 27, 2016, CIGNA's May 4, 2017 Internal Appeal Denial Letter reinterpreted Mr. Adaikkappan's responses that had been offered a year earlier.

144.    Interestingly, CIGNA's initial denial letter had made no mention of Mr. Adaikkappan's "Disability Questionnaire & Activities of Daily Living" responses. However, CIGNA subsequently would attempt to use those responses to justify its opinion on appeal.

145.    CIGNA's May 4, 2017 Internal Appeal Denial Letter used Mr. Adaikkappan's response, offered a year earlier, that he used a computer "4 to 5 hrs per day" as supporting a conclusion that he should be able to use a computer for six (6) hours in a "workday." CIGNA then used that determination to conclude that Mr. Adaikkappan did not qualify as partially disabled.

146.    Of course, Mr. Adaikkappan was responding about a 24-hour day, not a "workday" as that is generally understood. Mr. Adaikkappan was using the term "day" in the typical sense of one 24-hour calendar day.

147.    CIGNA's "Disability Questionnaire & Activities of Daily Living" form did not offer an alternate definition of the term "day."

148.     Thus, despite having approved the claim with Mr. Adaikkappan's response in hand, Defendant CIGNA's Denial Letter now reinterpreted the response aggressively against the Plaintiff, Mr. Adaikkappan.

149.     CIGNA failed to seek any clarification from Mr. Adaikkappan before denying the claim.

150.     In the May 4 letter, CIGNA conceded that a Federal complaint under ERISA Section 502(a) was available.

151.     In the May 4 letter, CIGNA noted that Mr. Adaikkappan was "entitled to receive, upon written request and free of charge, information relevant to Mr. Adaikkappan's claim for benefits."

152.     On May 16, 2017, a request for all information relevant to CIGNA's unfavorable claim determination was sent to CIGNA.

153.     CIGNA received this request on May 22, 2017.

154.     On June 12, 2017, CIGNA timely produced the records at issue.

155.     Those records reveal that CIGNA offered a bad-faith game of "guess what we want" to Mr. Adaikkappan regarding the sufficiency of medical documentation that would satisfy continuance of the already approved partial LTD claim.

156.     CIGNA never informed Mr. Adaikkappan about what Mr. Adaikkappan should produce in order to sustain his previously-approved partial LTD claim.

157.     In the mandatory internal appeal, one of CIGNA's "independent" medical experts actually found it relevant that, in the appeal, Mr. Adaikkappan was able to explain his medical condition and his inability to perform a full-time work schedule. That purportedly independent

evaluator wrote: "[T]his claimant spent the entire Letter writing about how he cannot work, and not trying at all to finds [*sic*] ways that he could do full time work."

158.    This same reviewer noted that the appeal letter "suggested that CIGNA has [*sic*] this claimant examined by a physician of CIGNA choosing (which likely is a very good suggestion)."

159.    However, rather than accept this opinion, CIGNA chose not to incur the expense of an independent medical evaluation, but instead simply denied the claim altogether.

160.    This same reviewer also noted "Based on this self-reporting [by Mr. Adaikkappan in the CIGNA Disability Questionnaire and Activities of Daily Living form], surveillance of this Claimant's true daily activities would be of significant interest in assessing this Claimant's true disability."

161.    However, rather than accept this opinion, CIGNA chose not to incur that expense, and instead denied the claim altogether.

## CLAIMS FOR RELIEF

## COUNT I – DEFENDANT WRONGFULLY DENIED PREVIOUSLY-APPROVED PARTIAL DISABILITY BENEFITS DUE UNDER THE LTD PLAN

162.    Paragraphs 10-161 are incorporated herein by reference.

163.    Defendant wrongfully denied Plaintiff's previously-approved claim for partial LTD benefits under an LTD Plan subject to ERISA.

164.    WHEREFORE, Plaintiff seeks relief under 29 U.S.C. § 1132(a)(1)(B), to recover benefits due to him under the terms of the plan and to clarify his rights to future benefits under the terms of the plan.

165.    Regarding clarification of rights to future benefits under the terms of the plan, Plaintiff seeks a determination that not only was he disabled under the terms of the plan for his "own occupation," but that he was also disabled under the terms of the plan for "any occupation" as well.

166.    Plaintiff seeks reasonable attorney fees and costs of this action, pursuant to 29 U.S.C. § 1132(g)(1), as well as prejudgment interest for benefits wrongly withheld since September 16, 2016.

167.    Plaintiff further seeks prejudgment interest for Defendant's inexcusable delay in paying for the admittedly payable benefits from April 11, 2016 through September 15, 2016.

168.    Plaintiff seeks any other such relief this Court deems equitable and appropriate given Defendant's pattern of bad faith conduct toward its insured in this matter.

## COUNT II – DEFENDANT FAILED TO TIMELY PRODUCE PLAN POLICY DOCUMENTS

169.    Paragraphs 10 through 161 are incorporated herein by reference.

170.    Defendant owed Plaintiff a duty under 29 U.S.C. § 1024(b)(4) to provide, upon Plaintiff's request, a copy of the LTD Plan Policy contract, as well as any other instruments under which the plan was established or operated.

171.    Plaintiff requested a copy of these LTD Plan Policy documents on July 26, 2016. Defendant acknowledged receipt of Plaintiff's request.

172.     Thirty (30) days from July 26, 2016 would have been August 25, 2016.

173.     Defendant violated 29 U.S.C. § 1132(c)(1)(B) by failing to furnish the LTD Plan Policy within 30 days after receipt of Plaintiff's request.

174.     Plaintiff did not receive the LTD Plan Policy until October 8, 2016, 74 days after the LTD Plan Policy request had been received by Defendant.

175.     Pursuant to 29 U.S.C. § 1132(c)(1)(B), the Defendant may be held personally liable to Plaintiff in the amount of $100.00 per day from the date of failure, August 25, 2016.

176.     WHEREFORE, Plaintiff requests that Defendant be held liable to Plaintiff in the amount of $4,400.00, for the 44 days in excess of 30 days in providing Plaintiff with the LTD Plan Policy.

177.     Plaintiff also requests, pursuant to 29 U.S.C. § 1132(c)(1), "such other relief" as the Court deems just and proper given Defendant's pattern of bad faith conduct toward its insured in this matter.

## COUNT III – DEFENDANT VIOLATED THE LTD PLAN TERMS BY FAILING TO CONDUCT AN INDEPENDENT MEDICAL EXAMINATION BEFORE DENYING A PREVIOUSLY-APPROVED DISABILITY CLAIM

178.     Paragraphs 10-161 are incorporated herein by reference.

179.     Under 29 U.S.C. § 1132(a)(3)(B), a beneficiary of an ERISA plan may bring an action to enjoin or to "obtain other appropriate equitable relief" regarding any violation of "any provision of this subchapter or the terms of the plan[.]"

180.     The LTD Plan's "Definition of Optimum Ability" provision reads, in relevant part: "The Employee's ability to work is based on the following . . . medical evidence submitted

by the Employee; . . . [and] evaluation of the Employee's ability to work by not more than three Independent Experts when required by the Insurance Company" to determine optimum working ability.

181.    Thus, if the Defendant, had wanted to disregard the previously acceptable medical evidence submitted by Plaintiff concerning his disability, then the Defendant had a duty under the LTD Plan to schedule at least one Independent Expert for a real, in-person medical evaluation of Plaintiff. The LTD Plan provision regarding evaluation by Independent Experts exists for no other purpose, and therefore it can be read no other way but to impose this duty on the Defendant.

182.    Defendant, as the Claims Administrator of the LTD Plan, violated the terms of the LTD Plan by failing to schedule an independent medical examination before reversing itself and denying the Partial LTD Claim.

183.    The Defendant's failure to even attempt to schedule an independent medical examination before determining that previously sufficient information had become insufficient was a violation, under 29 U.S.C. § 1132(a)(3)(A), of the "Definition of Optimum Ability" term of the LTD Plan.

184.    WHEREFORE, Plaintiff respectfully requests "appropriate equitable relief . . . to redress such violations" of "the terms of the plan" under 29 U.S.C. § 1132(a)(3)(B) in this case, which demonstrates a pattern of bad faith conduct by Defendant toward its insured.

**COUNT IV – DEFENDANT VIOLATED THE LTD PLAN TERMS BY FAILING TO PAY ADMITTEDLY PAYABLE BENEFITS PURSUANT TO THE LTD PLAN'S "TIME OF PAYMENT" TIMEFRAMES**

185.     Paragraphs 10-161 are incorporated herein by reference.

186.     Under 29 U.S.C. § 1132(a)(3)(B), a beneficiary of an ERISA plan may bring an action to enjoin or to "obtain other appropriate equitable relief" regarding any violation of "any provision of this subchapter or the terms of the plan[.]"

187.     The LTD Plan's "Time of Payment" provision reads, in relevant part: "Disability Benefits will be paid at regular intervals of not less frequently than once a month."

188.     Plaintiff was eligible for partial LTD benefits effective April 11, 2016.

189.     Though long in possession of the related STD claim records, after six and a half weeks from the date of eligibility, CIGNA approved the partial LTD claim on May 27, 2016.

190.     Plaintiff, through no fault of his own, did not receive any benefit payment in June 2016.

191.     Plaintiff, through no fault of his own, did not receive any benefit payment in July 2016.

192.     In late August 2016, CIGNA finally released nearly four months' worth of partial LTD benefit payments to Mr. Adaikkappan. This payment covered from April 11, 2016 through July 31, 2016.

193.     Defendant's inexcusable delay tendering payment was a violation, under 29 U.S.C. § 1132(a)(3), of the LTD Plan terms regarding "Time of Payment."

194.     WHEREFORE, "[A]ppropriate equitable relief . . . to redress such violations" of "the terms of the plan" is available under 29 U.S.C. § 1132(a)(3)(B). Plaintiff respectfully

requests such relief in this case, which demonstrates a pattern of bad faith conduct by Defendant toward its insured.

## COUNT V – DEFENDANT VIOLATED PLAN TERMS BY FAILING TO IDENTIFY "ADDITIONAL INFORMATION REQUIRED"

195.    Paragraphs 10-161 are incorporated herein by reference.

196.    Under 29 U.S.C. § 1132(a)(3)(B), a beneficiary of an ERISA plan may bring an action to enjoin or to "obtain other appropriate equitable relief" regarding any violation of "any provision of this subchapter or the terms of the plan[.]"

197.    The LTD Plan's provisions regarding written notice of denials reads, in relevant part, that claim denials must indicate "Any additional information required for the claim to be reconsidered, and the reason this information is necessary."

198.    Defendant issued a denial of benefits notice on September 16, 2016.

199.    The September 16, 2016 denial of benefits notice did not state what information was required for the claim to be reconsidered, or the reason such information was necessary.

200.    Defendant's failure to offer a clear statement regarding what information was required, and why it was required, was a violation under 29 U.S.C. § 1132(a)(3) of the LTD Plan terms regarding written notice of claim denials.

201.    WHEREFORE, "[A]ppropriate equitable relief . . . to redress such violations" of "the terms of the plan" is available under 29 U.S.C. § 1132(a)(3)(B). Plaintiff respectfully requests such relief in this case, which demonstrates a pattern of bad faith conduct by Defendant toward its insured.

**COUNT VI – DEFENDANT VIOLATED PLAN TERMS BY FAILING TO IDENTIFY "ANY INTERNAL RULE, GUIDELINE OR PROTOCOL RELIED ON IN MAKING THE CLAIM DECISION"**

202.     Paragraphs 10-161 are incorporated herein by reference.

203.     Under 29 U.S.C. § 1132(a)(3)(B), a beneficiary of an ERISA plan may bring an action to enjoin or to "obtain other appropriate equitable relief" regarding any violation of "any provision of this subchapter or the terms of the plan[.]"

204.     The LTD Plan's provisions regarding written notice of denials reads, in relevant part, that disability claim denials must identify "any internal rule, guideline or protocol relied on in making the claim decision[.]"

205.     Defendant issued a denial of benefits notice on September 16, 2016.

206.     The September 16, 2016 denial of benefits notice did not identify "any internal rule, guideline or protocol" used to make the decision.

207.     This omission can only lead to two conclusions: one, that the decision was not based on any internal rule, guideline or protocol, thereby making the decision arbitrary and capricious, or two, that the decision violated the LTD Plan's terms regarding that which must be provided in a disability claim denial.

208.     Defendant's failure to identify any internal rule, guideline or protocol that led to this disability claim denial, was a violation under 29 U.S.C. § 1132(a)(3) of the LTD Plan terms regarding written notice of claim denials.

209.     WHEREFORE, "[A]ppropriate equitable relief . . . to redress such violations" of "the terms of the plan" is available under 29 U.S.C. § 1132(a)(3)(B). Plaintiff respectfully

requests such relief in this case, which demonstrates a pattern of bad faith conduct by the Defendant toward its insured.

Respectfully submitted,

_____
**DANIEL M. McLEAN, ESQUIRE**
PA Bar #93609
225 Cornell Avenue
Swarthmore, PA 19081
(P) 610-331-4259
(F) 844-897-5287
dmcleanesq@gmail.com
Attorney for Plaintiff