

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| VIJAY MURUGESH ADAIKKAPPAN | : | CIVIL ACTION |
| | : | |
| v. | : | No. 17-4351 |
| | : | |
| LIFE INSURANCE COMPANY OF | : | **FILED UNDER SEAL** |
| NORTH AMERICA | : | |

**FILED**

MAR 21 2019

KATE BARKMAN, Clerk
By_____ Dep. Clerk

## MEMORANDUM

**Juan R. Sánchez, C.J.**                                                          **March 21, 2019**

Plaintiff Vijay Murugesh Adaikkappan brings this action seeking long-term disability benefits under Section 502(a)(1)(B) of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132(a)(1)(B). He alleges Defendant Life Insurance Company of North America (LINA) wrongly discontinued disability benefits he was entitled to receive under the long-term disability plan sponsored by his employer, McKesson Corporation (McKesson).[1] Both parties have moved for summary judgment. Because the Court finds LINA's decision to terminate Adaikkappan's benefits was arbitrary and capricious, the Court will grant Adaikkappan's summary judgment motion and deny LINA's summary judgment motion.

---

[1] Adaikkappan also brought claims alleging that LINA failed to timely produce the long-term disability plan policy, failed to conduct an independent medical examination, failed to timely pay benefits, failed to identify additional medical information required under the plan, and failed to identify the internal rule relied on in making the claim decision. Compl. 20-25. However, the Court dismissed these claims pursuant to LINA's unopposed motion to dismiss. *See* Order, Dec. 15, 2017, ECF No. 9.

3/21/17  Mail: All counsel

**FACTS[2]**

In October 2006, Adaikkappan was hired by McKesson as a Business System Analyst. Administrative Record (A.R.) 1070. As a Business System Analyst, Adaikkappan was required to "plan[], conduct[], and direct[] the analysis of healthcare business problems." A.R. 1147. The Occupational Data sheet for Adaikkappan's position provides that the position physically involved walking and standing, as well as lifting, carrying, pushing, and pulling up to ten pounds. A.R. 1209. Adaikkappan's Business System Analyst position was classified a light duty position. *Id.*

As part of its benefits package, McKesson sponsored a short-term disability (STD) plan and a long-term disability (LTD) plan (the Plan), and purchased an insurance policy from LINA to fund and pay benefits pursuant to the Policy.[3] LINA also served as the claims administrator. Under the Policy, employees are entitled to up to 24 months of LTD benefits if they are (1) unable to perform the material duties of their own occupation; and (2) unable to earn 80% or more of their earnings from working in their own occupation (the Own Occupation Standard). Following the 24-month period, the Policy's definition of "disability" changes. After 24 months, "an employee is considered [d]isabled if . . . he . . . qualifies for disability benefits form the Social Security

---

[2] When reviewing cross-motions for summary judgment, the "court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Schlegel v. Life Ins. Co. of N. Am.*, 269 F. Supp. 2d 612, 615 n.1 (E.D. Pa. 2003) (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2720 (3d ed. 1998)); *see also Appoloni v. United States*, 450 F.3d 185, 189 (6th Cir. 2006) (noting a court must evaluate each cross-motion for summary judgment "on its own merits and view all facts and inferences in the light most favorable to the nonmoving party" (internal quotation marks and citation excluded)). The facts presented herein are undisputed.

[3] McKesson's short-term disability plan is not at issue in this case. However, because Adaikkappan's short-term disability benefit claim transitioned into the long-term disability claim at issue in this case and is referenced within the administrative record, the Court will briefly discuss LINA's evaluation of Adaikkappan's short-term disability claims for completeness.

Program" (the Social Security Standard). Once a disability benefit is approved, LINA requires employees to submit continuing proof of their disability to continue receiving benefits. Through an appointment of claim fiduciary (ACF) form, LINA was appointed as the claim fiduciary under the Policy. The ACF provides LINA "the authority, in its discretion, to interpret the terms of the Plan, including the Policies; to decide questions of eligibility for coverage or benefits under the Plan; and to make any related findings of fact." A.R. 1277.

In 2006, Adaikkappan suffered an injury to his left calf.[4] Beginning in 2008, Adaikkappan began experiencing swelling in his previously injured calf. An ultrasound conducted in 2010, revealed Adaikkappan had developed a blood clot in his left leg. In May 2012, a venous duplex study of Adaikkappan's left leg revealed there was a thrombus obstructing the mid and distal portions of his left superficial vein. On September 13, 2013, Dr. Robert DiGiovanni, Adaikkappan's vascular specialist, placed him in a compression stocking to contain edema occurring in the left leg. Dr. DiGiovanni noted Adaikkappan complained he could not "stand for prolonged periods of time, or sit for more than two hours without significant pain developing in his left lower extremity from proximal hip to ankle." A.R. 696. One month later, on October 28, 2013, Dr. DiGiovanni prescribed the use of a "lymphedema pump 40 to 60 mmHg [for] one to two hours at a time[,] once or twice a day[,] to be used over his left compression stocking." *Id.* Dr. DiGiovanni indicated there was no surgical venous endovascular procedure available to treat Adaikkappan's condition.

---

[4] The Administrative Record does not specify the exact injury Adaikkappan sustained in 2006.

3

Over the next few months, Adaikkappan was diligent in using the lymphedema pump and compression stocking per Dr. DiGiovanni's orders. On April 15, 2014, Adaikkappan saw Dr. DiGiovanni for a follow-up visit. At this appointment, Dr. DiGiovanni noted:

> [Adaikkappan] has two reasons for pain in his left leg, one is neuropathy and the other is retention of congestive fluid which sometimes aggravates neuropathy. If he stands, he has more pain than if he sits. This would go along with changes in the spinal canal which could attribute to the neuropathy.

A.R. 698. Dr. DiGiovanni further determined the lymphedema pump could be adapted to his need for pain and congestion relief, and that Adaikkappan had discretion for deciding "the time of when it should be done and is more efficient in regard[] to the relief." *Id.*

One month later, on May 12, 2014, Adaikkappan was admitted to the emergency department of Chester County Hospital, reporting two weeks of hemoptysis. Two days later, Adaikkappan saw his primary care physician Dr. Leonard Giunta, who diagnosed him with chronic bronchitis, dyspnea, and weakness. Dr. Giunta informed Adaikkappan he should stay home from work, to which he abided.

As a result of Dr. Giunta's orders, Adaikkappan filed a 100% STD claim on May 16, 2014. LINA approved this STD claim through June 8, 2018, noting that based on his diagnoses, "it [was] reasonable to approve." A.R. 422. On June 3, 2014, LINA reapproved Adaikkappan's STD benefits through June 30, 2014, indicating the "clinical information reviewed . . . showed severity in condition that may impact [Adaikkappan's] ability to function." A.R. 411.

On June 16, 2014, Papastavros Associates Medical Imaging (Papastavros) conducted a Doppler ultrasound of Adaikkappan's left leg, which revealed a mural thrombus throughout the left superficial femoral vein. The report provided that a "a mural thrombus generally indicates an older thrombus [but blood] flow is seen within the vein." A.R. 820. A week later, Dr. Giunta completed a disability form for Adaikkappan diagnosing him with chronic venous insufficiency

4

and secondary lower left leg lymphedema and noted new pulmonary symptoms were being treated. A.R. 810. Dr. Giunta also diagnosed Adaikkappan with hemoptysis, dyspnea, and weakness; increased his use of the lymphedema pump to three times a day; and instructed him to rest and stay away from work. *Id.* Pursuant to this ultrasound and disability form, LINA reapproved Adaikkappan's STD benefits through July 25, 2015.

The following month, at a July 28, 2014, follow-up visit, Dr. Giunta documented significant weight loss in Adaikkappan. Dr. Giunta further diagnosed him with hemoptysis, myofascial pain syndrome, dyspnea, weakness, chest pain, and venous insufficiency. One month later, on August 1, 2014, Dr. Giunta wrote a prescription stating Adaikkappan should not return to work—to which he abided. On August 22, 2015, LINA reapproved Adaikkappan's STD benefits and back dated the approval through August 15, 2015, advising him he would need to submit additional medical testing for continued benefits past that date.

On September 5, 2014, Adaikkappan had a new Doppler ultrasound performed by Papastavros. This ultrasound revealed a new onset clot formation in the left popliteal vein. The report of the study stated, "[b]ecause of this clot being present insufficiency was not able to be examined due to the danger of dislodging a clot." A.R. 767. Adaikkappan was diagnosed with chronic thrombophlebitis. On September 9, 2014, Adaikkappan was seen by gastroenterologist Dr. Steven Goldstein. At this visit, Dr. Goldstein diagnosed Adaikkappan with hemorrhoids, hyperbilirubinemia, abnormal liver function tests, weight loss, and irritable bowel syndrome. Dr. Goldstein also prescribed medical nutrition therapy.

Later that month, Adaikkappan underwent an upper extremity electromyography (EMG) test on his right arm. The EMG revealed that Adaikkappan suffered from moderate right ulnar neuropathy in his right elbow. The same day, LINA discontinued Adaikkappan's STD benefits on

5

the basis that "new medical [information] was not received to further evaluate [his] claim." A.R. 365. As a result, on September 26, 2014, Adaikkappan saw neurologist Dr. Thomas Graham. Dr. Graham diagnosed Adaikkappan with skin sensation disturbance, ulnar nerve lesion, medial nerve lesion, and injury to his sciatic nerve.

By November 2014, Adaikkappan stopped seeing Dr. Giunta as his primary care physician and went under the care of Dr. Jyothirmayi Malireddy. On November 25, 2014, Dr. Malireddy diagnosed Adaikkappan with the following illnesses: (1) myofascial pain, (2) chronic venous insufficiency, (3) chronic obstructive pulmonary disorder, (4) carpal tunnel syndrome, (5) sciatic and ulnar neuropathy, and (6) irritable bowel syndrome. At the time, Adaikkappan was continuing to use the lymphedema pump three times a day. Dr. Malireddy further noted that use of the lymphedema pump was difficult for him due to his myofascial pain syndrome and the fact that his neuropathy and back problems prevented him from continuously sitting. *See* A.R. 764.

Adaikkappan appealed the denial of the STD claim on December 10, 2014. While his STD appeal was pending, at the direction of Dr. Malireddy, vascular surgeon Dr. Robert Meisner, conducted a venous ultrasound of Adaikkappan's left leg. Dr. Meisner reported that the ultrasound revealed "evidence [of] left deep venous reflux" and "post thrombotic scarring."

In mid-January 2015, Adaikkappan attempted to return to work on a reduced schedule. He started by working two hours a day—a quarter of his full-time employment schedule. On January 28, 2015, Adaikkappan saw Dr. Malireddy again, who found he was continuing to suffer from myofascial pain, neuropathy, and Raynaud's syndrome. Dr. Malireddy opined that Adaikkappan was only capable of working a part-time schedule moving forward.

The following month, on February 5, 2015, LINA overturned its discontinuation of STD benefits, stating: "[o]verall, based on diagnosis of extensive left leg [Deep Vein Thrombosis

6

(DVT)] and reported lymphedema necessitating frequent lymphedema pump use, reasonable to support [restrictions and limitations] from last approved date through beginning of January 2015." A.R. 342. The same month, Adaikkappan reported to Dr. Malireddy he was experiencing leg pain after an hour of sitting. In addition to reiterating his previous diagnoses, Dr. Malireddy diagnosed him with a tear of medial cartilage/meniscus of the knee as well as hypoglycemia. *See* A.R. 684. Dr. Malireddy ordered Adaikkappan to receive nutritional counseling due to his significant weight loss and hypoglycemia counseling.

On March 4, 2015, Dr. Malireddy filed out "Disability Management Solutions Medical Request" form for LINA. A.R. 678. On this form, Dr. Malireddy informed LINA that Adaikkappan was "unable to perform fine motor functions . . . [and] has difficulty in prolonged sitting, generalized weakness, and fatigue . . . ." A.R. 678. Dr. Malireddy also provided that Adaikkappan "cannot sit more than one hour in a stretch due to his pain." *Id.* In a companion Physical Ability Assessment form submitted by Dr. Malireddy, she indicated Adaikkappan could only sit "[o]ccasionally" during the day. Pursuant to the Physical Ability Assessment form, this meant Adaikkappan could only sit for "0-2.5 Hrs/Day [or] 0-1/3 of the Day." A.R. 679. Adaikkappan continued working on a part-time basis.

Beginning in September 2015, Adaikkappan attempted to return to work on a full-time basis. At the end of the month, Papastavros conducted another Doppler ultrasound study at the direction of Dr. Malireddy due to Adaikkappan's history of "[v]enous insufficiency" and previous DVT on his left leg. A.R. 1177. This study showed "the femoral vein on the left to be contracted and completely occluded." *Id.* An addendum to the report noted that the left iliac vein was six millimeters, two millimeters smaller than the right iliac vein, meaning blood flow was significantly limited.

7

On October 9, 2015, Adaikkappan determined he could not maintain his full-time work schedule and his work day was reduced to four-hours per day. That same day, Dr. Malireddy saw Adaikkappan because he was experiencing abdominal bloating and discomfort. Adaikkappan reported he could "smell blood in his throat" and he was experiencing melena. Adaikkappan further informed Dr. Malireddy that his gastroenterologist and hematologist instructed him to stop taking his anticoagulant, which appeared to resolve his melena. At this visit, Dr. Malireddy diagnosed Adaikkappan with gastroesophageal reflux disease (GERD), resolved melena, and gastritis. Three days later, on October 12, 2015, after being unable to continue working on a full-time basis, Adaikkappan filed a 50% STD claim.

On October 16, 2015, Dr. Malireddy completed another disability form for LINA in regard to Adaikkappan's STD claim. In this form, Dr. Malireddy stated the primary diagnoses were (1) severe compression of the left iliac vein, (2) thrombophlebitis of the left femoral vein, (3) lymphedema, and (4) venous insufficiency. Dr. Malireddy listed additional conditions including myofascial pain and median and ulnar neuropathy. Dr. Malireddy noted Adaikkappan could only work four hours per day, from home with frequent breaks every hour, physical activity, and use of his lymphedema pump. At this point, Dr. Malireddy had also increased Adaikkappan's use of the lymphedema pump to four times a day. In response, LINA approved Adaikkappan's STD benefits claim.[5]

On November 18, 2015, Adaikkappan underwent a venous ultrasound study. The study was based on Adaikkappan's chronic venous insufficiency and a follow up for his deep venous thrombosis in his left leg. The study found

- Chronic deep venous thrombosis in the left proximal femoral vein, mid femoral vein, and popliteal vein

---

[5] This STD benefits claim was reapproved through January 31, 2016. A.R. 183, 208.

8

- , Thrombus description:
  - Vein is *completely occluded* at the proximal and mid femoral vein level, partly occluded at the distal femoral vein and popliteal levels
  - *Chronic in nature* (hyperechoic, well attached, rigid, thickened vein walls, irregular borders, contracted vein if obstruction, larger collateral vein)

A.R. 1166 (emphasis added). The ultrasound also revealed valvular insufficiency with venous reflux in the left great saphenous vein and in the left small saphenous vein, as well as venous insufficiency with extrasaphenous tributary reflux of the left saphenous veins in the calf and thigh. A.R. 1168-69.

A week later, on November 25, 2015, Dr. Malireddy completed another Medical Request Form for LINA. Dr. Malireddy indicated the same diagnoses as the October 16, 2018, Medical Request Form and noted the same necessity of hourly breaks, physical therapy, and use of a lymphedema pump. A.R. 1170-73.

The following month, on December 21, 2015, Adaikkappan saw Registered Nurse Practitioner Ruth Brobst. Brobst diagnosed Adaikkappan with skin paresthesia, Raynaud's syndrome without gangrene, B-vitamin deficiency, and myalgia for his chronic pain. A.R. 1155. Three days later, Adaikkappan saw gastroenterologist Dr. Albert Hahm, who diagnosed Adaikkappan with GERD, esophagitis, irritable bowel syndrome, melena, bloating, low body mass index, and elevated total bilirubin. A.R. 1161-62.

Nine days later, on December 30, 2015, Adaikkappan underwent a lower extremity venous insufficiency study at the direction of Dr. Malireddy. The study revealed (1) evidence of left deep vein reflux at the level of the femoral vein and popliteal vein; (2) significant lesser saphenous vein reflux; (3) left posterior tibial vein perforator with significant reflux; and (4) thrombotic scarring of the deep vein system consistent with post-thrombotic syndrome. A.R. 1153.

9

On January 28, 2016, Dr. Malireddy completed a fourth Medical Request Form for LINA. Like the previous Medical Request Forms, Dr. Malireddy noted the pertinent diagnoses were (1) severe compression of the left iliac vein, (2) thrombophlebitis of the left femoral vein, (3) lymphedema, (4) chronic deep vein thrombosis, (5) venous insufficiency, and (6) Raynaud's phenomenon. Dr. Malireddy further indicated physical activity breaks were required every hour, use of a lymphedema pump should continue three-four times a day, and that four hours of work per day was recommended. At the request of Dr. Malireddy, on February 29, 2016, Adaikkappan underwent a "Vascular Lower Extremities Venous Insufficiency and Lower Extremities DVT Study Procedure." A.R. 1138. The study revealed chronic left leg DVT.

On March 23, 2016, LINA concluded Adaikkappan's STD benefits dating back to October 2015, should be rescinded because he failed to meet the disability benefits waiting period set forth by McKesson.[6] A.R. 163. Adaikkappan appealed this determination. On April 10, 2016, while his appeal was pending, Adaikkappan's STD benefits period expired, and his STD claim transitioned into the instant LTD claim.

On April 15, 2016, Adaikkappan returned to Dr. DiGiovanni who ordered a Pulse Volume Recording (PVR) study due to Adaikkappan experiencing "numbness and pain due [when exposed] to the cold temperatures." A.R. 1081. Prior to the PVR study, Adaikkappan's Ankle-brachial index levels were normal. However, after immersion in an ice bath mix, the PVR study found persistent blood-flow limiting effect that was "consistent in the clinical setting with Raynaud's physiology." A.R. 1082.

---

[6] A benefit waiting period is a block of time an employee must wait before benefits are available to the employee.

On April 25, 2016, LINA upheld its adverse benefits determination finding Adaikkappan failed to meet the benefits waiting period. However, McKesson later ordered LINA to overturn its STD benefits denial based on revisions McKesson made to its internal policy regarding the benefits waiting period. Consequently, LINA reversed its decision at the direction of McKesson.

On April 28, 2016, Adaikkappan completed a Disability Questionnaire and Activities of Daily Living form provided by LINA. In this questionnaire, Adaikkappan stated he could work "4-5 hours," "reads the Bible for an hour per day," and was awake between "15.5 to 17 hours per day." A.R. 1069. Along with listing his daily activities, Adaikkappan noted his difficulty in engaging in recreational activities due to his need to frequently use the lymphedema pump. *Id.* Adaikkappan also noted that he tries to use a stationary bike to improve blood flow to his leg, however, due to his health issues, he can only do so "for a short time." A.R. 1070. Furthermore, Adaikkappan informed LINA his physicians told him his vascular, neurological, and gastrointestinal conditions were incurable, and as a result, he was not expected to see his physicians as frequently unless the conditions worsened. A.R. 1068-73.

Subsequently, on May 2, 2016, Adaikkappan saw neurologist Dr. Thomas H. Graham. During this visit, Dr. Graham diagnosed Adaikkappan with untreatable Raynaud's syndrome without gangrene, vitamin B12 deficiency without symptom improvement postreplenishment, fibromyalgia and myofascial process, and being severely underweight, along with the prior diagnoses of sciatic nerve injury, ulnar and median nerve lesion, and skin sensation disturbance. A.R. 1075-80.

On May 10, 2016, LINA's Nurse Case Manager Shirley Dungao began reviewing Adaikkappan's LTD benefits claim by reviewing his office visit notes from "9/25/15 to 4/28/16." A.R. 108. Dungao concluded "[t]here is not enough medical documentation [to] demonstrate

functional loss." *Id.* Dungao escalated Adaikkappan's LTD claim to Nurse Case Manager Octavia Hopkins for a second internal review. In this review, Hopkins only reviewed medical records from October 15, 2015 to April 7, 2016, and concluded the "[m]edical [record] does not continually support all imposed restrictions from 10/10/15 to 4/7/16 and from 4/7/16 forward as evidenced by customer's condition noted to be old/chronic in nature, no abnormal lab values, no noted difficulty ambulating, and no strength measurements of any extremities." A.R. 103. Hopkins escalated the matter to LINA internal doctor Dr. Stephen Stclair for a third internal review. Dr. Stclair reviewed the same records as Hopkins and concluded Adaikkappan was not at all functionally limited from full-time work. A.R. 98.

On May 23, 2016, LINA had vocational counselor Jessica Bohne call Adaikkappan. The following day, based on their conversation and contrary to Dungao, Hopkins, and Dr. Stclair's opinion, Bohne concluded: "[Dr. Malireddy's] listed restrictions [on Adaikkappan's ability to work] are not consistent with the required physical demands of [his] occupation." A.R. 90. Thus, LINA approved Adaikkappan's LTD claim, awarding him LTD benefits from April 7, 2016 until recertification.

Two days later, May 25, 2016, Dr. Malireddy saw Adaikkappan as he was having back pain—self-reported at a nine out of ten severity—which was preventing him from sleeping. In the office visit notes for this appointment, Dr. Malireddy documented twenty active diagnoses including the chronic vascular and neurological diagnoses that previously prevented Adaikkappan from working on a full-time basis.

Two months later, on July 11, 2016, LINA changed the case manager responsible for Adaikkappan's LTD claim again to Adrineh DerGalestian. The following day, DerGalestian began reevaluating Adaikkappan's LTD claim for recertification of his disability. The same day, LINA's

vocational rehabilitation counselor Karen Franz reviewed Adaikkappan's file for return-to-work potential. Franz concluded that "based on today's limited review . . . , [Adaikkappan] appears to *not be an appropriate candidate* for services due to severity of [his] medical condition. It appears that [he] is working at maximum capability for now." A.R. 75 (emphasis added). At this point, Adaikkappan was continuing to work four hours per day.

Five days later, Adaikkappan saw Dr. Malireddy again. Dr. Malireddy's office visit notes from this appointment state Adaikkappan was still suffering from "chronic IBS symptoms, chronic lymphedema, leg pain, multiple joint pains, neuropathic pain, Reynaud's phenomenon, and muscle spasms." A.R. 1049. An examination of Adaikkappan's left leg also revealed chronic venous stasis changes, mild varicosities, and edema. Two weeks later, on July 26, 2018, DerGalestian called Adaikkappan to ask "for an update on [his] condition and what was keeping [him out of work]." A.R. 71. DerGalestian followed up with Adaikkappan again on September 7, 2016, asking him if he was seeing any other healthcare provides aside from Dr. Malireddy and Dr. Graham, to which Adaikkappan responded that he was not.

DerGalestian subsequently assigned Adaikkappan's file to Nurse Case Manager Geoia Reyes, instructing her the "[d]ates of records to review [are] 5/2/16 to present[,]" A.R. 57,  and informing her Adaikkappan has "a long list of conditions, but no medical records to confirm the diagnosis," *id.*[7] Reyes ultimately determined Adaikkappan was not disabled because he had "unchanged clinical presentation, unchanged symptoms, and unchanged exams." A.R. 53. Reyes escalated the review to LINA's internal doctor, Dr. Dennis Korpman for a second review. Like

---

[7] In total, for the recertification of his disability benefits, Adaikkappan submitted the following documentation (1) the office visit notes from the May 2, 2016, visit with Dr. Graham; (2) the office visit notes from the May 25, 2016 visit with Dr. Malireddy; and (3) the office visit notes from the July 16, 2016 visit with Dr. Malireddy. A.R. 53.

Reyes, Dr. Korpman also concluded Adaikkappan could properly perform his job functions for at least six hours a day and was not disabled under the Plan. A.R. 51. Dr. Korpman's analysis, however, did not cite to any specific medical records supporting his position. As a result of this review, LINA discontinued Adaikkappan's LTD benefits as of September 16, 2016.

On January 26, 2017, Adaikkappan appealed LINA's discontinuation of his LTD benefits. In support of his appeal, Adaikkappan submitted one letter from Dr. Malireddy stating he could not work more than four hours per day and a three-page letter he drafted. The undated letter from Dr. Malireddy provides that based upon his diagnoses, Adaikkappan is "advised to take part time work, 4 hrs/day." A.R. 1018. Adaikkappan's three-page letter details, in his own words, his medical conditions, the frequent physical therapy breaks he needs to obtain temporary relief from his condition, and the difficulties he has managing work with his numerous chronic conditions. A.R. 1019-21.

LINA subsequently referred Adaikkappan's file to an independent review service for review by board-certified neurologist Dr. Mostaga Farache, and board-certified cardiologist Dr. Gary Barone. Both Dr. Farache and Dr. Barone reviewed Adaikkappan's medical records from September 2015 through September 2016. Dr. Farache ultimately concluded Adaikkappan was not disabled, focusing on Dr. Graham's inability to offer a medical treatment for Adaikkappan's documented neurological issues. Dr. Farache further stated he could not opine on the degree to which his cardiovascular issues impaired his ability to work. Dr. Barone determined Adaikkappan's cardiovascular ailments did not render him disabled because (1) he could sit at a computer for "4-5 hours" a day and read the Bible for approximately an hour a day—which Dr. Barone assumed would be done while sitting—equaling a total of six hours where he could be working; (2) it was unclear how Adaikkappan spent his remaining hours awake, which could be

14

dedicated to working; and (3) Adaikkappan was capable of writing a detailed letter in support of his appeal, but was "not at all trying to find[] ways that he could do full time work." A.R. 997-1001.  On May 4, 2017, crediting the opinions of Dr. Farache and Dr. Barone, LINA denied Adaikkappan's appeal.

On September 29, 2017, Adaikkappan filed the instant action seeking a reinstatement of his LTD benefits. Both parties have moved for summary judgment. Adaikkappan contends LINA's decision to discontinue his LTD disability benefits was arbitrary and capricious because LINA ignored the medical evidence in the record detailing his significant disabilities and exhibited a predisposition toward denying his claim based on LINA's handling of his STD claims. LINA contends it did not arbitrarily and capriciously discontinue Adaikkappan's benefits because he failed to submit additional evidence recertifying his disability and had two independent physicians review his claim. Adaikkappan and LINA's motions are now ripe for decision.

**DISCUSSION**

A motion for summary judgment will only be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A factual dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and internal quotation marks omitted). In determining whether to grant summary judgment, the court "must view the facts in the light most favorable to the non-moving party, and must make all reasonable inferences in that party's favor." *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005). The court applies the same standard when deciding

cross-motions for summary judgment as the standard applied when only one party has filed a summary judgment motion. *See Selected Risks Ins. Co. v. Schwabenbauer*, 540 F. Supp. 22, 24 (E.D. Pa. 1982).

The standard of review of LINA's decision to terminate Adaikkappan's benefits is arbitrary and capricious, also known as the abuse of discretion standard.[8] An administrator's decision is arbitrary and capricious only "if it is without reason, unsupported by substantial evidence or erroneous as a matter of law." *Abnathya v. Hoffmann–La Roche, Inc.,* 2 F.3d 40, 45 (3d Cir. 1993) (citations and internal quotation marks omitted). "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Hunter v. Caliber Sys., Inc.*, 220 F.3d 702, 710 (6th Cir. 2000) (citation omitted).

---

[8] When an ERISA policy grants discretionary authority to the administrator to determine a claimant's eligibility for benefits, the appropriate standard of review is "arbitrary and capricious." *See Estate of Schwing v. The Lilly Health Plan*, 562 F.3d 522, 525 (3d Cir. 2009). As noted, contained within the Plan documents is an Authorization of Claim Fiduciary (ACF) Form. Through the ACF, McKesson appointed LINA as the claim fiduciary under the Policy. In pertinent part, the ACF states LINA "shall have the authority, in its discretion, to interpret the terms of the Plan, including the Policies; to decide questions of eligibility for coverage or benefits under the Plan; and to make any related findings of fact." A.R. 1277.

Adaikkappan disputes the validity of the ACF asserting it is invalid because it is (1) partially handwritten; (2) superseded by an amendatory rider to the Policy; and (3) is undated. Despite his arguments to the contrary, Adaikkappan's arguments are meritless because (1) he provides no legal basis to support his assertion that the partially handwritten portion of the ACF is invalid; (2) the alleged superseding rider explicitly states it "shall not be deemed to affect or supersede other Plan documents," A.R. 9082, and (3) the ACF is an amended Plan document that backdates itself to the effective date of the policy, A.R. 1277. Therefore, because the ACF delegates discretionary authority to LINA, the proper standard of review is arbitrary and capricious. *See Neal v. Life Ins. Co. of N. Am.*, No. 16-1146, 2017 WL 321497, at *2 (W.D. Pa. Jan. 23, 2017) (finding an ACF granted LINA discretionary authority and applying the arbitrary and capricious standard); *Gailey v. Life Ins. Co. of N. Am.*, No. 15-564, 2016 WL 6082112, at *4 (M.D. Pa. Oct. 17, 2016) (applying the arbitrary and capricious standard where the employer signed an ACF form).

Although the arbitrary and capricious standard is highly deferential, the court must still consider the quality and quantity of the medical evidence and the opinions on both sides of the issues, so as to avoid rendering courts "nothing more than rubber stamps for any plan administrator's decision." *Glenn v. MetLife*, 461 F.3d 660, 674 (6th Cir. 2006), *aff'd sub nom. Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008) (citation omitted); *see also Foley v. Int'l Bhd. of Elec. Workers Local Union 98 Pension Fund*, 91 F. Supp. 2d 797, 805 (E.D. Pa. 2000). However, the court is limited to the evidence before the administrator at the time he reviewed and decided the claim.[9] *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 440 (3d Cir. 1997). In evaluating the administrator's decision, a court must review two aspects: (1) "structural concerns regarding how the particular ERISA plan was funded," and (2) "various procedural factors underlying the administrator's decision-making process." *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 845 (3d Cir. 2011).

The structural inquiry in an arbitrary and capricious review focuses on the financial incentives or conflicts of interest created by the plan's organization. In *Metropolitan Life Insurance Co. v. Glenn*, the Supreme Court held a reviewing court, in determining whether the plan administrator had abused its discretion in denying benefits, should consider the conflict of interest arising from the dual role of an entity that acts as both an ERISA plan administrator and a payer of plan benefits. 554 U.S. at 112; *see also Firestone Tire & Rubber Co. v. Bruch*, 489 U.S.

---

[9] With his motion for summary judgment, Adaikkappan attaches additional medical documentation that were not part of the administrative record before LINA. These documents provide additional evidence supporting Adaikkappan's disability claim. A court, however, may only consider evidence outside of the Administrative Record where the evidence is "is related to interpreting the plan or explaining medical terms and procedures relating to the claim." *Schlegel v. Life Ins. Co. of N. Am.*, 269 F. Supp. 2d 612, 618 (E.D. Pa. 2003). Because these documents were not before LINA at the time it reviewed Adaikkappan's LTD claim and do not relate to interpreting the Plan, medical terms, or claim procedures, the Court will not consider them. *Id.* (refusing to consider additional neuropsychological evaluations of the claimant where they were issued after the appeals process).

101, 115 (1989). When this conflict exists, the standard of review does not change, but the reviewing court must consider the conflict and its case-specific importance to determine if the administrator has abused his discretion. *Id.* at 115-16.

The procedural inquiry, on the other hand, "focuses on how the administrator treated the particular claimant" and if irregularities in the review process cast doubt on the administrator's impartiality. *Miller*, 632 F.3d at 845 (quoting *Post v. Hartford Ins. Co.*, 501 F.3d 154, 162 (3d Cir. 2007)). Examples of procedural anomalies that suggest arbitrariness include: (1) reversing a decision to award benefits without new medical evidence to support the change in position, (2) relying on the opinions of non-treating over treating physicians without reason, (3) conducting self-serving paper reviews of medical files, (4) failing to address all relevant diagnoses before terminating benefits, (5) relying on favorable parts while discarding unfavorable parts in a medical report, and (6) denying benefits based on inadequate information and lax investigatory procedures. *See Harper v. Aetna Life Ins. Co.*, No. 10-1459, 2011 WL 1196860, at *2 (E.D. Pa. Mar. 31, 2011) (citations omitted) (citing cases from the Court of Appeals for the Third Circuit).

With regard to reports by treating physicians, while ERISA "does not require that plan administrators give the opinions of treating physicians special weight, courts must still consider the circumstances that surround an administrator ordering a paper review [from a non-treating physician]." *Post*, 501 F.3d at 166 (citation omitted); *see also Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003). Plan administrators may not arbitrarily refuse to credit a claimant's reliable evidence, which may include a treating physician's opinion, but a court cannot "require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when

18

they credit reliable evidence that conflicts with a treating physician's evaluation." *Nord*, 538 U.S. at 834.

With these standards in mind, the Court turns to LINA's decision to terminate Adaikkappan's benefits. Under the Policy, Adaikkappan could only continue to receive benefits if he demonstrated a continuing entitlement to disability benefits. A.R. 957, 968. Therefore, to continue to qualify for LTD benefits after his initial approval, Adaikkappan was required to provide continuing proof of his disability. LINA asserts it discontinued Adaikkappan's LTD benefits because he failed to provide adequate proof of continuing disability after LINA requested updated medical records from him. Based on the record, the Court finds LINA's discontinuation of Adaikkappan's LTD benefits was arbitrary and capricious.

At the outset, LINA, as insurer for the Plan, both funded and administered the award of disability benefits. This structural conflict is a factor the Court must weigh in its evaluation of the administrator's decision, but it does not change the standard of review. *See Metropolitan Life Ins. Co.*, 554 U.S. at 112. Thus, the Court considers this factor in conjunction with any procedural defects of the administrator's decision.

Regarding the procedural defects, Adaikkappan does not expressly assert any of the six procedural anomalies articulated by the Third Circuit. Instead, he relies on LINA's wavering opinions on his STD benefits claims to show a pattern or practice of LINA seeking to defeat Adaikkappan's disability claims and a predisposition to denying his "looming LTD benefits claim." Pl.'s Reply Memo. In Supp. Summ. J. Mot. 3. While the Court may consider LINA's pre-final decisions "as evidence of the decision-making process that yielded the final decision[,]" *see Van Arsdel v. Liberty Life Assurance Co. of Bos.*, 267 F. Supp. 3d 538, 589 (E.D. Pa. 2017), the Court must focus on LINA's post-appeal decision, *see Funk v. CIGNA Grp. Ins.*, 648 F.3d 182,

191 n.11 (3d Cir. 2011). Notwithstanding Adaikkappan's lack of argument as to the procedural defects, the administrative record demonstrates that LINA's decision suffered from the procedural anomaly of relying on the opinions of non-treating physicians, which were unsupported and in contradiction to the record, without reason. *See Harper*, 2011 WL 1196860, at *2.

As noted by LINA's May 4, 2017, letter denying Adaikkappan's LTD claim, LINA stated it reviewed his "complete file" when addressing his appeal. A.R. 442. This file contained the exhaustive diagnoses and medical tests recited above and demonstrated Adaikkappan's chronic venous insufficiency issues and related health issues. In addition, the complete record demonstrated Adaikkappan could not work more than four hours per day, required frequent physical therapy breaks every hour, and needed to use the lymphedema pump for three to four times a day for extended periods of time. Moreover, it contained information demonstrating Adaikkappan's inability to work for sustained periods of time. As LINA set forth in its initial LTD disability approval, these conditions rendered Adaikkappan disabled under the Own Occupation Standard set forth in the Plan.

However, when LINA requested Adaikkappan recertify his medical conditions in mid-2016, LINA arbitrarily and capriciously changed its position on Adaikkappan's disability status. While LINA contends Adaikkappan failed to sufficiently supplement his file with additional medical information demonstrating his disability, the record contravenes this assertion. As LINA notes, Adaikkappan submitted three additional office visit notes from Dr. Malireddy and Dr. Graham in support of his recertification. While these documents did not provide additional lab tests—the absence of which Adaikkappan had already informed LINA about in light of Dr. Malireddy's statement that he would undergo less frequent testing because his conditions were

chronic and incurable—they reiterated the same chronic and incurable diagnoses that originally supported LINA's approval of Adaikkappan's LTD claim.

Rather than view these new office visit notes in light of the already voluminous record of medical evidence, LINA arbitrarily and capriciously ignored the existing record and relied on non-treating physician opinions—which were unsupported and in contradiction to the record—throughout the review process. Beginning with Nurse Case Manager Geoia Reyes, she stated "[Adaikkappan] has provide[d] a long list of conditions, but no medical records to confirm diagnosis." However, this statement is in direct contradiction of the numerous medical tests demonstrating Adaikkappan's chronic and incurable medical issues that supported his initial LTD approval, as well as the updated office visit notes listing these conditions as active diagnoses. While Reyes's failure may have resulted from DerGalestian instructing her that the "[d]ates of records to review[are] 5/2/16 to present[,]" A.R. 57, her determination remains improper because she failed to account for the additional medical information contained within the record.[10] Moreover, the Plan did not require Adaikkappan to demonstrate his disability by providing new medical testing each time LINA asked him to recertify his disability. On the contrary, the Plan only required "continued proof of [Adaikkappan's] [d]isability for benefits to continue." A.R. 967.

Next, Dr. Korpman's opinion that Adaikkappan was not disabled under the Plan is also of little weight and unsupported by the record or medical research. Dr. Korpman's opinion does not provide any citations to pertinent medical records supporting his conclusion or medical research

---

[10] In its response to Adaikkappan's motion for summary judgment, LINA contends it was proper for Reyes to only review the new medical documentation in deciding whether Adaikkappan should continue to receive LTD benefits. Resp. to Pl.'s Mot. for Summ. J. 9-10. However, LINA's argument is belied by the fact that, on appeal, it provided its two independent review doctors with medical records dating back to September 2015, A.R. 992-1001, and its assertion in its denial letter that it reviewed Adaikkappan's "complete file[,]" A.R. 442.

contradicting Dr. Malireddy and Dr. Graham's conclusions. Dr. Korpman's analysis merely provides: "[t]he treating providers opinion is not well supported by medically acceptable clinical or laboratory diagnostic techniques and is inconsistent with the other substantial evidence in the claim file." A.R. 51. Like Reyes's conclusion, this is in stark contradiction to the documented medical evidence and testing provided in the record. Dr. Korpman provides nothing more than a unsupported, bald assertion that Adaikkappan was not disabled. *Cf. Bluman v. Plan Adm'r and Trs. for CAN's Integrated Disability Program*, 491 F. App'x 312, 315 n. 4 (3d Cir. 2012) (holding an administrator's decision to not credit a treating physician was not arbitrary and capricious where the non-treating physician drew different conclusions based on specific analysis of previous studies provided in the administrative record); *Stratton v. E.I. Dupont De Nemours & Co.*, 363 F.3d 250, 258 (3d Cir. 2004) (holding an administrator's decision to not credit a treating physician was not arbitrary where the administrator's physician referred to studies contradicting the treating physician's claim); *Post*, 2005 WL 2455818, at *15-16 (finding the administrator did not arbitrarily   and capriciously fail to credit the treating physician's diagnoses following an independent medical evaluation of the claimant). Thus, LINA's internal review of Adaikkappan's claims did not provide a sufficient basis for LINA to overturn Adaikkappan's LTD benefits claim.

Turning to LINA's assertion its decision to terminate Adaikkappan's benefits was not arbitrary or capricious because, on appeal, it relied on two independent board-certified physicians' reviews of Adaikkappan's file, this argument fails for similar reasons. Specifically, (1) Dr. Farache's neurological opinion was of limited value as his only supported conclusion was that Dr. Graham could not treat Adaikkappan's neurological conditions; and (2) Dr. Barone's cardiovascular opinion was contrary to the record, determined primarily on Addaikkappan's self-reporting, and demonstrated a significant bias against Adaikkappan as a claimant.

Initially, Dr. Farache's opinion was of limited value to any determination of Adaikkappan's disability. At the outset, out of the numerous medical records he received from LINA, Dr. Farache only focused on Dr. Graham's note from Adaikkappan's May 2, 2016, office visit. In addition to this narrow focus, Dr. Farache's opinion fails to explain why Adaikkappan's neurological issues are unsupported in light of the record evidence documenting his limiting neurological conditions. Even focusing solely on Dr. Graham's note, the diagnoses section of the note lists the same neurological issues that previously contributed to Adaikkappan's limited ability to work and supported LINA's earlier finding of disability. While Dr. Graham's note did focus on new symptoms ailing Adaikkappan at the time of his office visit, Dr. Farache's opinion is devoid of analysis as to why the other diagnoses in the note should be ignored or found unreliable in light of the other medical records in the record. Further, Dr. Farache's opinion also focused on Dr. Graham's conclusion that "there was nothing neurologically to offer [Adaikkappan treatment wise]." A.R. 995. However, Dr. Farache's opinion fails to explain how Dr. Graham's inability to treat Adaikkappan's ailments connects to his inability to perform his job functions. Thus, Dr. Farache's opinion is of limited value to assessing Adaikkappan's disability.

Next, with respect to Dr. Barone's opinion, after reviewing Adaikkappan's medical records—including records that previously supported a finding of disability—he determined Adaikkappan was "able to perform fulltime employment without restrictions and limitation." A.R. 1000. While Dr. Barone stated he reviewed records dating back to September 2015, his report focused on Adaikkappan's self-reported April 28, 2016, Disability Questionnaire & Activities of Daily Living form and letter he submitted in support of his appeal.[11] As noted, in this questionnaire,

---

[11] Dr. Barone's opinion letter improperly states the Disability Questionnaire & Activities of Daily Living was completed on April 23, 2016. A.R. 1000. As noted, the correct date is April 28, 2016. A.R. 1070.

23

Adaikkappan stated he could work "4-5 hours," "reads the Bible for an hour per day," and was awake between "15.5 to 17 hours per day." A.R. 1069. Dr. Barone extrapolated from this questionnaire and Adaikkappan's letter, that Adaikkappan could easily work six hours a day because (1) he could sit at a computer for "4-5 hours" a day and read the Bible for approximately an hour a day—which he assumed would be done sitting—equaling a total of six hours where he could be working; (2) he did not specify how he spent the remainder of his time awake, which could be dedicated to working; and (3) he was capable of writing a three-page letter in support of his appeal over the course of several months. A.R. 997-1001. Not only did Dr. Barone's review ignore the medical evidence contained within the record and draw a conclusion without providing supporting medical reasoning, it also sets forth an unattainable standard for claimants to receive disability benefits. Based on Dr. Barone's report, a claimant in a light duty position could not receive disability benefits if he or she is mentally conscious for at least six hours a day.

Moreover, Dr. Barone's report demonstrated a significant bias against Adaikkappan as a disability claimant. As noted, in support of his appeal, Adaikkappan drafted a letter describing his medical conditions, constant pain, and difficulty working for prolonged periods of time. Rather than address the letter's substance, Dr. Barone concluded Adaikkappan is "[o]bviously able to sit and work at his computer. Claims he enjoys his work. However, [he] spent the entire [l]etter writing about he cannot work, and not trying at all to find[] ways that he could do full time work." A.R. 998. Not only does Dr. Barone's review appear to misunderstand the nature of an LTD benefits claim—i.e., it is the claimant's burden to establish his or her disability, not that he or she is capable of working—it appears he held against Adaikkappan that he could write a letter describing his conditions. Taken to its logical conclusion, Dr. Barone's draconian conception of claimants' rights would permit ERISA administrators to deny benefits unless a claimant was

24

rendered entirely unable to function by his or her disability. Such an onerous requirement is neither contained in the Plan, nor imposed by law, and Dr. Barone's suggestion to the contrary therefore must be rejected.

Finally, like LINA's internal review and with respect to Dr. Farache and Dr. Barone's opinions, both fail to provide a valid basis for concluding that Adaikkappan was not disabled under the Own Occupation Standard. Unlike *Stratton*, where the Third Circuit held a professional disagreement of physicians premised upon reliable, empirical evidence does not render an administrator's decision arbitrary and capricious, 363 F.3d at 258, here, Dr. Farache and Dr. Barone's opinions lack citation or reference to supporting medical evidence and rely upon inappropriate extrapolation. *See also Bluman*, 491 F. App'x at 315 n. 4; *Post*, 2005 WL 2455818, at *15-16. Accordingly, considering LINA's structural conflict of interest and its continued reliance on the opinions of non-treating physicians, which were unsupported and in contradiction to the record without reason, there are no genuine issues of material fact that LINA's decision to discontinue Adaikkappan's LTD benefits was arbitrary and capricious.

Because LINA's decision to discontinue Adaikkappan's LTD benefits was arbitrary and capricious, the Court must fashion an appropriate remedy. Adaikkappan requests the Court award him benefits for the "first 24 months of his [LTD] claim" and remand for further determination as the whether he is disabled under the Social Security Standard definition that begins after the 24-month "own occupation" benefits period expires.

When an insurer arbitrarily and capriciously terminates a claimant's benefits after previously awarding them, it is appropriate to retroactively award benefits and return a claimant to the status quo he enjoyed before the termination of his benefits. *See Miller*, 632 F.3d at 856-57 ("In the termination context . . . a finding that a decision was arbitrary and capricious means that

the administrator terminated the claimant's benefits unlawfully. Accordingly, benefits should be reinstated to restore the status quo."). Therefore, the Court awards Adaikkappan retroactive benefits through April 7, 2018, the expiration of the 24-month period for "own occupation" benefits under the Policy.[12] Additionally, because LINA has not made a determination as to whether Adaikkappan is entitled to benefits under the Social Security Standard, the case shall further be remanded to LINA for further determination as to whether Adaikkappan is disabled as of the date the Social Security Standard took effect. *See, e.g. Heim v. Life Ins. Co. of N. Am.*, No. 10-1567, 2012 WL 947137, at *11-15 (E.D. Pa. Mar. 21, 2012) (reinstating benefits through the 24-month period where the Own Occupation Standard was in effect and remanding for determination of disability under the Social Security Standard).

Adaikkappan also seeks interest on the unpaid benefits. "[A]n ERISA plaintiff who prevails under § 502(a)(1)(B) in seeking an award of benefits may request prejudgment interest under that section as part of his or her benefits award." *Skretvedt v. E.I. DuPont De Nemours*, 372 F.3d 193, 208 (3d Cir. 2004). Prejudgment interest should be granted "unless exceptional and unusual circumstances exist making the award of interest inequitable." *Id.* (quoting *Anthius v. Colt Indus. Operating Corp.*, 971 F.2d 999, 1010 (3d Cir. 1992)); *see also Kuntz v. Aetna Inc.*, No. 10- 00877, 2013 WL 2147945, at *12 (E.D. Pa. May 17, 2013). This case does not present exceptional or unusual circumstances that would make an award of prejudgment interest inequitable, and therefore, LINA must pay prejudgment interest as part of Adaikkappan's benefit award

Finally, Adaikkappan requests reasonable attorney fees. While the Court may, in its discretion, award attorneys' fees to prevailing parties in actions brought under ERISA, "[t]here is

---

[12] Adaikkappan's LTD benefits commenced on April 7, 2016 and therefore, the 24-month period to receive LTD benefits under the Own Occupation Standard ended on April 7, 2018.

no presumption that a successful plaintiff in an ERISA suit should receive an award [of attorney fees] in the absence of exceptional circumstances." *McPherson v. Emp.'s Pension Plan of Am. Re–Ins. Co., Inc.*, 33 F.3d 253, 254 (3d Cir. 1994). A district court must consider five factors in exercising its discretion in connection with fee applications: (1) the offending parties' culpability or bad faith; (2) the ability of the offending parties to satisfy an award of attorneys' fees; (3) the deterrent effect of an award of attorneys' fees against the offending parties; (4) the benefit conferred on members of the pension plan as a whole; and (5) the relative merits of the parties' position. *Id.* (citing *Ursic v. Bethlehem Mines*, 719 F.2d 670, 673 (3d Cir. 1983)). Because the Court must analyze these five factors to make a determination on an attorneys' fee award, any determination at this point would be premature. Therefore, if Adaikkappan seeks attorneys' fees, he must file a separate motion for attorney fees with supporting documentation. *See Kuntz*, 2013 WL 2147945, at *12.

**CONCLUSION**

For the reasons forth above, LINA's decision to deny Adaikkappan's LTD claim was arbitrary and capricious. There are no genuine issues of fact, and Adaikkappan is entitled to judgment as a matter of law. Adaikkappan's motion for summary judgment will be granted and LINA's motion for summary judgment will be denied.

An appropriate order follows.

BY THE COURT:

Juan R. Sánchez, C.J.

27