UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| VIJAY MURUGESH ADAIKKAPPAN,<br><br>Plaintiff,<br><br>v.<br><br>LIFE INSURANCE COMPANY OF NORTH AMERICA,<br><br>Defendant. | C.A. No. 2:17-cv-04351-JS |

## DECLARATION OF DANIEL M. McLEAN

Daniel M. McLean, Esquire, hereby declares under penalty of perjury as follows:

1. I am an attorney. I have been licensed to practice in the Commonwealth of Pennsylvania since 2004. I am admitted to practice in Federal Court in the Eastern and Middle Districts of Pennsylvania.

2. I graduated from Widener University Delaware School of Law in 2004. I wrote onto membership in the leading law review publication while there. I had a summer clerkship at the Delaware Office of the Public Defender.

3. To help pay for law school (extended division) I worked for four years full-time as a Records Clerk at the law firm of Young, Conaway, Stargatt & Taylor LLP in Wilmington, Delaware. The firm billed for my work at a rate below that of its Paralegals. Therein, I developed familiarity with the rigors and demands of billable hour record-keeping at that excellent firm, as

well as daily exposure to Delaware corporate law and securities/shareholder derivative lawsuit litigation.

4. Upon admission to the Supreme Court of Pennsylvania in 2004, I was hired by Hudson Legal Group of Philadelphia, Pennsylvania to begin full-time work for their client law firms, performing e-discovery document review for them.

5. To the best of my knowledge, the law firms would bill their clients for my work. To the best of my knowledge, the law firms found the use of contracted Document Review Attorneys to be a profitable endeavor for them. I was never privy to the rates the law firms charged their clients for my work. Presumably, the law firms would bill their clients for my work at a rate somewhere between their junior Associate Attorney rate, and their Paralegal rate.

6. In that capacity, I worked full-time in Philadelphia for Morgan, Lewis & Bockius LLP (twice), Pepper Hamilton LLP, Davis Polk & Wardwell LLP, and most significantly, more than seven (7) years for Dechert LLP. My total time as a full-time Document Review Attorney at all of these firms amounted to eight (8) years. The work at Dechert LLP was through Hudson Legal Group. Work at the non-Dechert LLP firms was through other similar agencies.

7. At all law firms, there were reasonable but sometimes challenging productivity expectations. At all firms, conflict checks were mandatory in all cases before I could commence work for the firm, to ensure no conflict between the firm and the client.

8. The vast majority of work at Dechert LLP was for a large pharmaceutical company client. Large-scale litigation had erupted after market withdrawal of a blockbuster medication, with potential exposure to the pharmaceutical company counted in terms of billions of dollars. Exposure was not just for product liability, though that was primary. Potential exposure was also for ERISA and employment law issues, including executive compensation issues, securities and

shareholder/director derivative liability with associated EDGAR filings review, potential criminal liability, and numerous efforts by State Attorneys General to recoup Medicaid expenditures.

9. I have personally known Plaintiff since 2009. I have previously successfully assisted Plaintiff with a landlord/tenant dispute. I have assisted Plaintiff with his dispute with Defendant since 2016, when Defendant's "STD Gatekeeper" attempted the rescission of all Short-Term Disability benefits at Week 24 (of 26) of the claim, though Defendant knew of Plaintiff's work schedule since at least Week 2 of the claim, an act deemed unreasonable and rejected by Plaintiff's employer McKesson, who was the payor and appeal arbiter under the Short-Term Disability policy.

10. In October 2012, I was hired by Executive Health Resources ("EHR") in Newtown Square, Pennsylvania as a Regulatory Research Attorney. EHR was, and remains, a subsidiary of Optum, Inc., which is a subsidiary of UnitedHealth Group, Inc. The job title was later rebranded to Regulatory Affairs Attorney. EHR has since been rebranded to Optum Physician Advisor Solutions, part of the Optum360 division of Optum, Inc.

11. The crux of the work at EHR involved assisting the company's approximately 3,000 client hospitals in claim denial disputes with Medicare. At its peak, EHR managed over one billion dollars in client hospital claim denials. My work there involved daily medical record review, daily appeal writing, and frequent hearings and argument before Federal Administrative Law Judges, wherein Medicare was aggressively represented by Associate General Counsels of Medicare federal contractors, many of whom held a direct or indirect contingency fee interest in upholding the Medicare claim denial.

12. EHR billed its client hospitals $500.00 per written appeal to the Medicare Appeals Council. I was given a productivity metric of 80 minutes per appeal, on average. This means that

EHR billed my services to client hospitals at a rate of $385.00 per hour. I wrote hundreds of these appeals while employed there.

13.  Ultimately, Medicare began offering settlements to hospitals. It eventually became clear to the leadership at Medicare, after my development and submission of the appeals briefs there, that it would be unwise for Medicare to continue to deny the claims that had been denied, because it would likely not go well for the government should the hospitals choose to assert their right to judicial review in Federal Court in a significant way. I played a significant role in getting Medicare to settle their claim denials. The settlements were worth a couple billion dollars, to thousands of affected hospitals. Ultimately, my success for the client hospitals was not adequately recognized by the Fortune 6 (six) employer, and I have left that employment to pursue better opportunities.

14.  Here, in this case, given my pharmaceutical and hospital-based legal experience, I brought a substantial amount of medical/legal experience to the litigation, countering the contention that "no acute distress" somehow meant perfectly well and not at all disabled. Additionally, prior legal experience with EDGAR and securities law helped me discover that the Appointment of Claim Fiduciary (ACF) could not have been *backdated* to the LTD Policy, because this LTD Policy didn't exist when this undated ACF allegedly was signed on behalf of Defendant (*see*, Plaintiff's Response Brief).

15.  As noted above, I have 14 years of full-time experience as an attorney in the greater Philadelphia region. A significant degree of litigation skill was necessary to bring this lawsuit to a favorable outcome, particularly when considering that *three* attorneys from a large law firm appeared on the record as opposing counsel in this matter, and when considering the inherently uphill battle posed by the application of a deferential "abuse of discretion" or "arbitrary and

4

capricious" standard of review that effectively tilts the legal scale at the outset in favor of the Defendant.

16. There was no contingency fee arrangement of any sort in this case between myself and Plaintiff. I endeavored to represent Plaintiff solely on the basis of receiving an award of attorney fees, if the representation were successful and if such an award were granted.

17. The Community Legal Services ("CLS") of Philadelphia fee schedule is a well-respected, objective barometer of reasonable attorney rates in the Philadelphia region. CLS provides a fee schedule for *what CLS would charge* if awarded attorney fees. For attorneys with 11-15 years of experience, CLS indicates $375-$450 per hour is an appropriate hourly rate range. Thus, an attorney fee rate of $425.00 per hour in this case is reasonable by objective, well-accepted local market standards.

18. The time spent litigating in this matter, including reviewing the 1277-page Administrative Record, investigating the Defendant's assertions, communicating with my client (for whom English is a second language—he speaks Tamil at home with his wife—and achieving success for my client this case against a recalcitrant insurer who determined to put my legal skills to the test, was reasonable and necessary under the circumstances of this case, and is documented in detail in the attached time sheets, also exhibited with this motion and memorandum.


Dated: _____      By: _____
                                    Daniel M. McLean, Esquire

capricious" standard of review that effectively tilts the legal scale at the outset in favor of the Defendant.

16. There was no contingency fee arrangement of any sort in this case between myself and Plaintiff. I endeavored to represent Plaintiff solely on the basis of receiving an award of attorney fees, if the representation were successful and if such an award were granted.

17. The Community Legal Services ("CLS") of Philadelphia fee schedule is a well-respected, objective barometer of reasonable attorney rates in the Philadelphia region. CLS provides a fee schedule for *what CLS would charge* if awarded attorney fees. For attorneys with 11-15 years of experience, CLS indicates $375-$450 per hour is an appropriate hourly rate range. Thus, an attorney fee rate of $425.00 per hour in this case is reasonable by objective, well-accepted local market standards.

18. The time spent litigating in this matter, including reviewing the 1277-page Administrative Record, investigating the Defendant's assertions, communicating with my client (for whom English is a second language—he speaks Tamil at home with his wife—and achieving success for my client this case against a recalcitrant insurer who determined to put my legal skills to the test, was reasonable and necessary under the circumstances of this case, and is documented in detail in the attached time sheets, also exhibited with this motion and memorandum.

Dated: 4/4/19

By: *Daniel M. McLean*
Daniel M. McLean, Esquire